UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

          340 Biscayne.

_____ /

BH DOWNTOWN MIAMI, LLC and
340 BISCAYNE OWNER LLC

          Plaintiffs,

CIRRUS 340 BB LENDER LLC, and
CIRRUS REAL ESTATE FUNDING LLC

          Defendants.

_____ /

Case No. 24-23028-LMI

Chapter 11

(Jointly Administered)

Adv. Proc. No. 25-01110-LMI
Chapter 11

## AMENDED ADVERSARY COMPLAINT AND OBJECTION TO CLAIMS

### IMPORTANT NOTICE TO CREDITOR:
### THIS IS AN OBJECTION TO YOUR CLAIM

**This amended adversary complaint includes an objection that seeks either to disallow or reduce the amount or change the priority status of the claim filed by you or on your behalf. Please read this objection carefully to identify which claim is objected to and what disposition of your claim is recommended.**

**If you disagree with the objection or the recommended treatment, you must file a written response within 30 days from the date of service of this objection, explaining why your claim should be allowed as presently filed, and you must serve a copy to the undersigned attorneys, OR YOUR CLAIM MAY BE DISPOSED OF IN ACCORDANCE WITH THE RECOMMENDATION IN THIS PLEADING.**

**If your entire claim is objected to and this is a chapter 11 case, you will <u>not</u> have the right to vote to accept or reject any proposed plan of reorganization until the objection is resolved, unless you request an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing your claim for voting purposes.**

**The written response must contain the case name, case number, and must be filed with the Clerk of the United States Bankruptcy Court.**

Plaintiffs, 340 Biscayne Owner LLC ("340 Biscayne") and BH Downtown Miami, LLC ("BH") (together, "Plaintiffs" or the "Debtors"), by and through undersigned counsel, hereby sue Cirrus 340 BB Lender LLC ("Lender") and Cirrus Real Estate Funding LLC ("Agent") (together, "Defendants" or "Cirrus"),[1] and allege:

## NATURE OF ACTION

1.      This is an adversary proceeding brought by the Plaintiffs pursuant to 11 U.S.C. §§ 502 and 1107(a), Federal Rules of Bankruptcy Procedure 3007, 7001, and 7007, and Local Rules 3007-1 and 7003-1, objecting to claims asserted by Cirrus and seeking affirmative relief for (1) breach of contract and breach of implied duty of good faith and fair dealing (PNA), (2) fraud in the inducement (PNA), (3) declaratory relief (breach of contract—rescission of PNA), (4) declaratory relief (fraud in the inducement—rescission of PNA), (5) usury, and (6) breach of contract (Loan Documents).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§157 and 1334, and Administrative Order 2012-25 of the Southern District of Florida, referring proceedings to this Court.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND AND PARTIES

5.      Plaintiff 340 Biscayne is a limited liability company organized under the laws of the State of Delaware and registered and authorized to transact its business in the State of Florida.

6.      Plaintiff BH is a limited liability company organized under the laws of the State of

---

[1] Cirrus and the Debtors are collectively referred to as the "Parties".

Delaware and registered and authorized to transact its business in the State of Florida.  BH owns 100% of the outstanding membership interests in 340 Biscayne.  The membership interest in 340 Biscayne is BH's only asset.

7.     Defendant Lender is a limited liability company organized under the laws of the State of Delaware.

8.     Defendant Agent is a limited liability company organized under the laws of the State of Delaware.

9.     On December 13, 2024 (the "Petition Date"), 340 Biscayne and BH filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing this bankruptcy case (Case No. 24-23028-LMI).

10.    Since the Petition Date, 340 Biscayne Owner and BH have operated as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

11.    As of the date hereof, no creditors' committee has been appointed in these cases. In addition, no trustee or examiner has been appointed.

### FACTUAL ALLEGATIONS

### Cirrus' Acquisition of the Prior Loan

12.    340 Biscayne is the fee simple owner of the real property located at 340 Biscayne Boulevard in Miami, Florida (the "Land") as well as the improvements located thereon (the "Building"), which house a hotel, commonly known as Holiday Inn Port of Miami-Downtown, (the "Hotel") (the Land, the Building and the Hotel are, collectively, the "Property").

13.    Prior to Closing on the Loan at issue, 340 Biscayne owned the Building, but held the Land as a ground lessee pursuant to a ground lease in favor of the then fee simple owner of the land ("Prior Lender").  At that time 340 Biscayne was also the borrower under a loan with Prior

Lender (the "Prior Loan") which was secured by, *inter alia*, the Building and 340 Biscayne's interest in the ground lease.

14.     While 340 Biscayne was a borrower under the Prior Loan, 340 Biscayne and Cirrus began negotiating the terms of a loan whereby Cirrus would refinance 340 Biscayne's Prior Loan (the "Refinancing Negotiations").  As part of the Refinancing Negotiations, Cirrus required that 340 Biscayne pay for its due diligence and provide it with confidential information, subject to a non-disclosure agreement. However, unbeknownst to 340 Biscayne, at the time, Cirrus ***surreptitiously*** negotiated with Prior Lender to *acquire* the Prior Loan and the Land behind 340 Biscayne's back, <u>*as its first of many acts of bad faith.*</u>

15.     Ultimately, Cirrus (through a related entity) acquired the Prior Loan and the Land from Prior Lender and stepped into its shoes (the "Loan Acquisition"), leaving 340 Biscayne in the precarious position of negotiating with Cirrus (now as 340 Biscayne's lender **and** ground lessor) without any alternative source of financing to pay-off the Prior Loan and acquire the Land.

16.     The relationship between – and relative negotiation positions of – Cirrus and 340 Biscayne changed overnight due to the Loan Acquisition and acquisition of the Land; Cirrus had placed itself in a position of power in the negotiation, execution, and consummation of the transaction, by becoming both 340 Biscayne's lender and ground lessor.  And, adding insult to injury, Cirrus used the confidential information ***<u>paid for</u>*** and ***<u>provided to it by</u>*** *340 Biscayne* as part of the Refinancing Negotiations to acquire the Prior Loan.

17.     Because 340 Biscayne's acquisition of fee simple title to the Land was crucial for the next stages of development of the Property, and the Prior Loan was fast approaching maturity, 340 Biscayne was left with no viable option but to refinance with Cirrus.

**340 Biscayne's Redevelopment Plan and the DPDA**

18.     Throughout the Parties' negotiations, Cirrus was aware of 340 Biscayne's plans to demolish the Building to prepare for redevelopment of the Property, the urgency of the demolition, and the planned use of the proceeds of the Loan to do so. The Parties had specific discussions about these plans both before and after the Loan Closing.   For example:

    a.  The original Term Sheet for the Loan discussed the precursors for the demolition of the existing Hotel.

    b.  As detailed, *infra*, as of March 2023 – prior to the Closing of the Loan – 340 Biscayne was negotiating an agreement with the owner of the neighboring property, PMG Downtown Developers LP ("PMG"), whereby PMG or an affiliated entity (the "Demolition Partner") would, *inter alia*, fund the demolition of the Building (the "Demolition and Pre-Development Agreement" or "DPDA").

    c.  On September 7, 2023, 340 Biscayne provided Lender with a draft of the Demolition and Pre-Development Agreement.

**Cirrus Loan**

19.     On or about April 24, 2023 (the "Loan Date"), 340 Biscayne and Cirrus entered into a loan agreement (the "Loan Agreement").  A true and correct copy of the Loan Agreement is attached hereto and incorporated herein as **Exhibit "A."**

20.     Pursuant to the Loan Agreement, 340 Biscayne delivered to Cirrus that certain Consolidated, Amended, Restated, Increased, Extended and Superseding Promissory Note in the original principal amount of $70,000,000.00 (the "Note") evidencing the loan (the "Loan").  A true and correct copy of the Note is attached hereto and incorporated herein as **Exhibit "B."**

21.     Prior to the closing of the Loan (the "Closing"), 340 Biscayne contributed

$4,000,000.00 cash to fund (a) the Interest Reserve that would be created under the Loan Agreement and used to pay interest due each month under the Loan and (b) other reserves (collectively, the "Reserves").  The Reserves were property of 340 Biscayne, but held by Cirrus under its exclusive control under the Loan Agreement.

22.    At Closing, a total of $74,100,000.00[2] was disbursed by the closing agent for the Loan and allocated in accordance with the Final Settlement Statement.

23.    The Loan and the Note are secured by, *among other things*, (i) the lien of a first mortgage on the Property (as hereinafter defined), (ii) a Sole Member Guaranty, made by BH for benefit of Lender (the "Member Guaranty") guarantying the amounts due under the Loan Agreement and Note, and (iii) a Pledge and Security Agreement, made by BH for benefit of Lender (the "Pledge") securing the obligations of BH under the Member Guaranty  (the Loan Agreement, together with the Note, the Pledge, the Member Guaranty, and all other documents evidencing or securing the Loan, as amended, modified, and assigned are collectively referred to herein as the "Loan Documents").  True and correct copies of the Member Guaranty and Pledge are attached hereto as **Exhibits "C"** and **"D,"** respectively.

24.    The terms of the Loan provided, *inter alia*, as follows:

a.    The Loan was to bear interest based upon Adjusted Term SOFR plus a Margin of 8% (the "Interest Rate").

b.    If any principal, interest or any other sum due under the Loan Documents was not paid by 340 Biscayne within ten (10) days of the date on which it was due, 340 Biscayne was to pay to Cirrus, upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable

---

[2] Cirrus contributed $100,000 toward the Reserves.

law.

    c.    In the event of Default, the Loan called for a Default Rate (the "Default Rate") equal to the lesser of (i) the Maximum Legal Rate, or (ii) of 15% above the then effective Interest Rate.

**Concrete Restoration and Recertification**

25.    While the Building is structurally sound, it is a 75-year-old building and therefore subject to recertification every 10 years pursuant to Miami-Dade County Code.

26.    In 2022, 340 Biscayne was involved in a series of hearings (the "Hearings") before the City of Miami Unsafe Structures Panel (the "Panel") related to remedial work necessary to recertify the building (the "Structural Work").

27.    In April 2022, the Panel issued an order setting forth a timeline to complete the Structural Work (as amended, the "Unsafe Structures Order").  340 Biscayne subsequently secured a building permit and began the Structural Work.

28.    The Loan Documents contemplated this Structural Work, and included, *inter alia*, provisions for the following:

    a.    340 Biscayne agreed to pay the cost of a Project Monitor to help Cirrus oversee the Structural Work[3];

    b.    Cirrus created a Structural Reserve, and, upon Closing, 340 Biscayne was required to deposit – and did deposit – into the Structural Reserve $600,000.00 of Structural Reserve Funds for 340 Biscayne's use;

    c.    Cirrus was to disburse the funds held in the Structural Reserve to 340 Biscayne upon satisfaction of certain conditions specified in Section 6.3.2 of the Loan

---

[3] Upon information and belief, Cirrus never used the funds for a project monitor, a project monitor was never retained and Cirrus simply kept the project monitor funds for itself.

Agreement to pay or reimburse 340 Biscayne for the Structural Work.

29.    From the Loan Date through present, 340 Biscayne has spent more than $700,000.00 on Structural Work.

30.    To satisfy the requirements of the Unsafe Structures Order, 340 Biscayne will need to undertake additional Structural Work at substantial cost to 340 Biscayne.

31.    To date, despite being on notice of the Structural Work performed and anticipated to be performed, Cirrus has refused to disburse any of the Structural Reserve Funds to 340 Biscayne or to apply it against the Loan balance.  Instead, Cirrus continues to earn and retain interest for its own benefit on those funds.

**Cirrus Intentionally Delays Review and Unreasonably Withholds Consent to DPDA**

32.    In or about March 2023 (prior to the Loan Closing), 340 Biscayne began negotiations with the Demolition Partner for the funding of the demolition of the Hotel pursuant to the Demolition and Pre-Development Agreement.

33.    The DPDA presented an extremely valuable opportunity for 340 Biscayne. As proposed, the Demolition Partner agreed to, *inter alia*, pay 340 Biscayne the sum of $10,000,000, which included up to $2,000,000 for the costs of demolition of the Building (the " DPDA Payment"),  (ii) prepare the Property, post-demolition, for use as a revenue-producing ground-level commercial parking facility, all at no cost to 340 Biscayne, and (iii) set up a sales center across the street from the Property, so that 340 Biscayne could market and sell the project it intended to develop, also at no cost to 340 Biscayne, leaving sufficient funds available to replenish the Interest Reserve and pay interest to Cirrus in full.

34.    In exchange for the $10,000,000 DPDA Payment and the other benefits under the DPDA, 340 Biscayne would grant Demolition Partner access to, and use of, an agreed-upon

portion of the Property for use as a construction staging area for up to two years, with the remaining portion of the Property to remain available for 340 Biscayne to utilize as an income-generating surface parking lot.

35. Once executed, the DPDA would have enabled 340 Biscayne to, *among other things*, (i) fund interest payments and replenish the Interest Reserve required by the Loan Documents to ensure payment of interest each month through the Maturity Date, (ii) eliminate the Hotel's operating costs while maintaining a revenue stream from the surface parking lot, (iii) eliminate further capital costs associated with bringing the Building into compliance with the Unsafe Structures Order,  (iv) open a sales center for the intended new project directly across the street from the Property at no cost to 340 Biscayne, and (v) obtain construction financing to pay Cirrus in full and move forward with the development of the Property.

36. But first 340 Biscayne needed written approval from Cirrus because: (a) the DPDA required 340 Biscayne to secure written acknowledgement from Cirrus outlining any terms and conditions Lender required for demolition, and (b) the Loan Agreement required Cirrus' prior approval in connection with any alterations to the Property. Thus, 340 Biscayne was unable to move forward with the DPDA without Cirrus' written consent.

37. On September 7, 2023 (the "DPDA Notice Date"), 340 Biscayne provided the then-current draft of the DPDA (the "September 2023 DPDA Draft") to Cirrus, noting at that time that it was the "ideal window of opportunity" to close on the DPDA "and fund reserves" for the Loan.

38. The September 2023 DPDA Draft provided for the deposit of $10,000,000 in escrow by the Demolition Partner for the benefit of 340 Biscayne to be paid as follows:

    a. Initial Payment: $2,000,000 to be transferred to 340 Biscayne's attorney and immediately released upon the execution of the DPDA (the "Initial Payment");

b. Second Payment: $2,000,000 upon vacation of the Building, which was to be completed within 90 days of execution of the DPDA (the "Second Payment"); and,

c. Final Payment: The remainder of $6,000,000, less the actual cost of the demolition work (including all softs costs, permitting costs, etc.) to be paid within ten days of the commencement of the demolition of the Building.

39.    Had Cirrus approved the DPDA in a timely manner, 340 Biscayne would have been able to pay the interest due each month on the Loan without interruption and replenish the Interest Reserve with sufficient funds to pay accruing interest through the Maturity Date.

40.    Additionally, once the demolition was completed, the unused portion of the Property would have been converted to a surface parking lot, with projected monthly income of approximately $500,000, with very little cost to 340 Biscayne.

41.    Fully aware of the urgency of the situation and the tremendous benefits of the DPDA, and despite the fact that Cirrus was familiar with the terms prior to the DPDA Notice Date, Cirrus intentionally delayed the process, taking excessive time to provide a list of "concerns" regarding the DPDA.  340 Biscayne promptly responded less than 24 hours later. Then, after having initially feigning alignment with the DPDA, Cirrus fell silent.[4]

42.    Despite numerous requests, Cirrus deliberately delayed its written reply to 340 Biscayne's response until the end of January  2024 – **_over four months later_**, knowing that the delay would likely kill the deal, which it eventually did.

43.    By Cirrus' delay and refusal to timely approve the DPDA, Cirrus intentionally caused 340 Biscayne to, _among other things_,  (i) default under the Loan by cutting off 340 Biscayne's ability to replenish the Interest Reserve, (ii) lose a significant income stream from the

---

[4] Cirrus went so far as to demand 340 Biscayne pay Cirrus $10,000 to engage a consultant to analyze the parking lot concept.  On information and belief, Cirrus kept the money and never used the funds to obtain a report.

parking lot that would have been constructed, (iii) incur additional costs for the maintenance of the Hotel and the Structural Work, and (iv) suffer further delays in development of the Property by blocking 340 Biscayne from taking the first step of development, i.e., demolition of the Building, which in turn precluded 340 Biscayne from obtaining construction financing. Most significantly, Cirrus' refusal caused 340 Biscayne to lose precious time, leaving 340 Biscayne at the mercy of Cirrus with no option but to attempt to negotiate a workout or refinance of the Loan **with Cirrus**.

### Cirrus Fraudulently Induces 340 Biscayne to Sign a Pre-Negotiation Agreement

44.     Towards the end of February 2024, Cirrus informed 340 Biscayne that it required that 340 Biscayne execute a Pre-Negotiation Agreement ("PNA") as a prerequisite to continue discussions.

45.     In the weeks leading up to the parties' signing of the PNA on March 29, 2024, Cirrus (through its Managing Member Tony Tufariello ("Tufariello")) promised 340 Biscayne during a series of phone calls and in-person meetings that Cirrus was ready, willing and able to, *inter alia*:

     a.  Grant 340 Biscayne authorization to demolish the existing Hotel on the Property;

     b.  Finalize and sign-off on the DPDA to enable 340 Biscayne to raise desperately needed capital to keep the Loan current, replenish the Interest Reserve, and allow 340 Biscayne to monetize the Property during the site development process;

     c.  Convert 340 Biscayne's loan to equity, enabling the Parties to jointly redevelop the Property;

     d.  Grant 340 Biscayne a loan extension; and

     e.  Resolve 340 Biscayne's alleged defaults on the Loan.

(together, the "Promises")

46.     Cirrus made the Promises for a singular but unlawful and deceitful purpose: to entice 340 Biscayne to sign the PNA and release and waive all claims, counterclaims, defenses and rights to sue Cirrus for damages and other relief. Cirrus knew that it was vulnerable to 340 Biscayne's meritorious claims, counterclaims and defenses arising from Cirrus' multiple breaches of the Loan Agreement and extreme bad faith in, *inter alia*, refusing to timely approve the DPDA.

47.     At the time Cirrus made each of the Promises, it had a specific and positive intent *not* to follow through, agree to, or perform *any* of the Promises it repeatedly made to 340 Biscayne. Stated differently, at the time Cirrus made each of the Promises, it had a present intent *not* to follow through, agree to, or perform *any* of the Promises it repeatedly made to 340 Biscayne.

48.     In March  2024, Cirrus sent 340 Biscayne a draft PNA. To give the appearance of being consistent with the parties' proposed joint redevelopment of 340 Biscayne's Property, the draft PNA included breakdowns of contemplated project mix, development budgets, fee schedules and anticipated returns from the proposed development.

49.     In reliance on Cirrus' Promises and the draft PNA detailing a joint redevelopment of the Property, 340 Biscayne executed the PNA on March 29, 2024.[5]  A true and correct copy of the PNA is attached hereto and incorporated herein as **Exhibit "E."**

50.     The PNA *appeared* to provide 340 Biscayne with a key benefit that Cirrus had previously denied it—i.e. Cirrus' <u>**written**</u> agreement as follows:

> [Cirrus] has had and is willing to continue to have discussions and negotiations (collectively, the "Negotiations") with Obligors [340 Biscayne] concerning the Loan, the Loan Documents and Obligors' obligations under the Loan Documents (collectively, the "Negotiation Topics") . . . ***Lender and Obligors agree to communicate on a commercially reasonable basis and frequency concerning the Negotiation Topics*** . . ."

---

[5] The PNA expressly provides that it is governed by Florida law.

PNA, p. 2.  (emphasis added). The PNA also provided 340 Biscayne a period of sixty (60) days commencing on May 1, 2024, during which Cirrus agreed, *inter alia*, to not impose default interest, accelerate the Loan, or seek foreclosure (the "Forbearance Period"), ostensibly so the parties could engage in "commercially reasonable" discussions with "commercially reasonable" frequency and to document the Promises Cirrus made to 340 Biscayne.

51.     Knowing the PNA was nothing but pretext and that it controlled the success or lack of success of the discussions, Cirrus preserved all its rights. Thus, the PNA provided that if the PNA Negotiations were unsuccessful (a condition entirely within Cirrus' control), Cirrus retained the right to *retroactively* charge default interest for the Forbearance Period and beyond and exercise its rights.  In other words, it gave up nothing.

52.     In sharp contrast, 340 Biscayne had to immediately release and waive all its claims, counterclaims, and defenses against Cirrus through and including the date of the PNA.  These concessions were critical to Cirrus, i.e., to eliminate all claims, counterclaims and defenses 340 Biscayne had, since, as alleged above, Cirrus never intended to comply with its obligations under the PNA or honoring the Promises on which 340 Biscayne had relied.

53.     Within weeks of signing the PNA, 340 Biscayne quickly realized that the PNA had changed absolutely nothing, except that Cirrus had duped 340 Biscayne into releasing and waiving all its claims, counterclaims and defenses.

54.     Despite the urgency of the DPDA, and the continuing accrual of significant default interest and other charges on the $70 Million Loan, Cirrus continued to stall, delay, obstruct, and otherwise act in a commercially unreasonable manner.

55.     On May 30, 2024, *more than two months after the PNA was executed*, Cirrus finally sent a draft Term Sheet to 340 Biscayne that was completely inconsistent with the parties' pre-

PNA discussions and did not include any of the Promises Cirrus repeatedly made to 340 Biscayne to induce 340 Biscayne to sign the PNA.

56.     In June 2024, during a phone call with Tufariello, 340 Biscayne expressed its deep frustration and concern with the draft Term Sheet Cirrus prepared. Tufariello acknowledged the inconsistencies and errors, took responsibility for the mistakes and suggested that 340 Biscayne prepare its own draft Term Sheet to present to Cirrus.

57.     On July 26, 2024, 340 Biscayne requested that Cirrus extend the Forbearance Period under the PNA. Tufariello said the parties should not "waste time or energy" on that but should instead focus on finalizing the Term Sheet and that "the details of interest payments due and other matters could be addressed in the Term Sheet."

58.     340 Biscayne sent its draft Term Sheet to Cirrus on July 29, 2024.

59.     True to form, Cirrus never responded.

**Cirrus's Rejection of DPDA & Termination of Forbearance**

60.     In mid-August 2024, after the expiration of the PNA, Cirrus informed 340 Biscayne *for the first time* that it required wholesale changes to the structure of the DPDA.

61.     At the same time Cirrus declared a maturity default (the "Default") and demanded default interest, late fees, legal fees, and other expenses, retroactively, totaling nearly $19.3 Million.

62.     On October 4, 2024, Cirrus issued a "Notice of Disposition of Collateral" in an expedited attempt to divest 340 Biscayne of its entire equity, development rights, and any potential future profits generated from the Property. Such an aggressive move highlighted Cirrus' demonstrated strategy all along—exploit its strong-arm lender position, intensify and take advantage of 340 Biscayne's financial strain, and force a foreclosure of 340 Biscayne's valuable

property and related interests.

63.     On October 22, 2024, Cirrus scheduled an auction of BH's membership interest in 340 Biscayne, which auction was to be conducted on December 17, 2024.

64.     The auction was stayed due to the filing of this Chapter 11 case.

**<u>Cirrus' Claims</u>**

65.     On February 20, 2025, Cirrus filed four *virtually identical* proofs of claim as follows:

    a.     In case 24-23028-LMI, Agent filed its Proof of Claim as to BH, asserting a secured claim in the amount of $98,525,616.99 ("Claim 3").  A true and correct copy of the Claim 3 is on file with the Court.

    b.     In case 24-23028-LMI, Lender filed its Proof of Claim as to BH, asserting a secured claim in the amount of $98,525,616.99 ("Claim 4").  A true and correct copy of the Claim 4 is on file with the Court.

    c.     In case 24-23025-LMI, Agent filed its Proof of Claim as to 340 Biscayne, asserting a secured claim in the amount of $98,525,616.99 ("Claim 10").  A true and correct copy of the Claim 10 is on file with the Court.

    d.     In case 24-23025-LMI, Lender filed its Proof of Claim as to 340 Biscayne, asserting a secured claim in the amount of $98,525,616.99 ("Claim 11").  A true and correct copy of the Claim 11 is filed at on file with the Court.

(collectively, the "Claims").

66.     Plaintiffs have engaged the undersigned counsel to bring this adversary proceeding and are obligated to pay reasonable attorneys' fees and costs.

## COUNT I

## BREACH OF CONTRACT AND BREACH OF
## DUTY OF GOOD FAITH AND FAIR DEALING (PNA)

67.    340 Biscayne realleges and incorporates paragraphs 1 through 66 as if fully set forth herein.

68.    This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing as to the PNA as required by the UCC.

69.    340 Biscayne and Cirrus entered into the PNA, a written contract.  The PNA is expressly governed by Florida law.

70.    The PNA contained an implied duty of good faith and fair dealing.

71.    Pursuant to the PNA, Cirrus expressly agreed "to communicate [with 340 Biscayne] on a commercially reasonable basis and frequency concerning the Negotiation Topics [i.e., the Loan, the Loan Documents, and 340 Biscayne's obligations under the Loan Documents]."

72.    340 Biscayne performed as required under the PNA.

73.    As more particularly alleged above, Cirrus breached the PNA and breached its duty of good faith and fair dealing under the PNA by, *inter alia*:

    a.  Failing to communicate with 340 Biscayne on a "commercially reasonable basis and frequency concerning the Negotiation Topics."  As more particularly alleged above, despite the urgency of the circumstances 340 Biscayne faced, Cirrus knowingly, intentionally and deliberately dragged its feet, avoided communications, and then waited 60 days to present 340 Biscayne with a Term Sheet that was completely inconsistent with the parties' pre-PNA discussions; and

    b.  Then, after suggesting that 340 Biscayne prepare its own draft Term Sheet, Cirrus failed to even respond and instead declared a Default just weeks later, imposing

nearly $19.3 Million in default interest, late fees, legal fees, and other expenses.

74.    Cirrus' breaches of its express obligation under the PNA, and its implied covenant of good faith and fair dealing under the PNA, to "communicate on a commercially reasonable basis and frequency concerning the Negotiation Topics," undermined the fundamental and essential purpose of the PNA, deprived 340 Biscayne of the benefit of the bargain, and frustrated 340 Biscayne's reasonable contract expectations.

75.    340 Biscayne performed under the PNA as required.

76.    All conditions required for Cirrus' performance had occurred.

77.    Cirrus' conduct was not consistent with 340 Biscayne's reasonable contractual expectations under the PNA.

78.    As a result of Cirrus' breaches of the PNA, 340 Biscayne incurred significant damage.

WHEREFORE, 340 Biscayne respectfully requests the entry of a judgment (a) finding Cirrus breached the PNA and its implied duty of good faith and fair dealing under the PNA (b) awarding damages against Cirrus, and (c) granting such other and further relief as is just and proper.

## COUNT II

## FRAUD IN THE INDUCEMENT (PNA)

79.    340 Biscayne realleges and incorporates paragraphs 1 through 66 as if fully set forth herein.

80.    This is an action for fraud in the inducement as to the PNA.

81.    As more particularly alleged above, in the weeks leading up to the signing of the PNA, Cirrus (through its Managing Member, Tufariello) expressly promised 340 Biscayne through

a series of phone calls and in person meetings that Cirrus was ready, willing and able to, *among other things*:

    a.   Grant 340 Biscayne authorization to demolish the existing Hotel on the Property and allow 340 Biscayne to monetize the Property during the site development process;

    b.   Finalize and sign-off on the DPDA to enable 340 Biscayne to raise desperately needed capital to keep the Loan current, replenish the Interest Reserve, and allow 340 Biscayne to monetize the Property during the site development process;

    c.   Convert 340 Biscayne's loan to equity, enabling the parties to jointly redevelop the Property;

    d.   Grant 340 Biscayne a loan extension; and

    e.   Resolve 340 Biscayne's alleged defaults on the Loan.

82.    At the time Cirrus (through its Managing Member, Tufariello) made each of the Promises, it had a specific and positive intent *not* to follow through, agree to, or perform *any* of the Promises it repeatedly made to 340 Biscayne. Stated differently, at the time Cirrus made each of the Promises, it had a present intent *not* to follow through, agree to, or perform *any* of the Promises it repeatedly made to 340 Biscayne.

83.    Cirrus made these false promises with the specific, deceptive, malicious and unlawful intent to induce 340 Biscayne to sign the PNA and release and waive all its claims, counterclaims and defenses against Cirrus. Cirrus made these false promises knowing that it (i) was significantly over-secured on the Loan, (ii) fully intended to seek collection of outrageous default interest, late fees, legal fees and other costs, and (iii) was not going to satisfy its express obligations under the PNA.

84.     340 Biscayne reasonably relied upon Cirrus' false promises, inducing it to sign the PNA.

85.     If Cirrus had not made its false promises, 340 Biscayne would *never* have signed the PNA and would *never* have released and waived its claims, counterclaims and defenses against Cirrus.

86.     As a result of 340 Biscayne' reasonable reliance upon Cirrus' false promises, 340 Biscayne suffered damages.

WHEREFORE, 340 Biscayne respectfully requests the entry of a judgment (a) finding that Cirrus fraudulently induced 340 Biscayne to sign the PNA (b) awarding 340 Biscayne damages against Cirrus and (c) granting such other and further relief as is just and proper.

## COUNT III

## DECLARATORY RELIEF
### (CIRRUS' BREACH OF PNA—RESCISSION)

87.     340 Biscayne realleges and incorporates paragraphs 1 through 66 as if fully set forth herein.

88.     This is an action for declaratory relief pursuant to section 86.011, Florida Statutes.

89.     Under the clear and unambiguous terms and conditions of the PNA, Cirrus *expressly* agreed to "communicate [with 340 Biscayne] on a commercially reasonable basis and frequency concerning the Negotiation Topics . . ."

90.     As more particularly alleged above, and as specifically alleged in Count I above, Cirrus materially breached the PNA and breached its implied duty of good faith and fair dealing by failing and otherwise refusing to "communicate [with 340 Biscayne] on a commercially reasonable basis and frequency concerning the Negotiation Topics." Cirrus' breaches went to the very essence and purpose of the PNA.

91.    Given Cirrus' material breaches of the PNA and Cirrus' breaches of its implied duty of good faith and fair dealing under the PNA, 340 Biscayne seeks a declaration that it is discharged of and released from all obligations under the PNA including, without limitation, its releases and waivers of its claims, counterclaims and defenses against Cirrus.

92.    Rescission of the PNA is an appropriate and effective remedy since the parties can be restored to the status quo before their execution of the PNA.

93.    340 Biscayne is in doubt as to its rights, status, and obligations to honor the releases and waivers under the PNA in light of Cirrus' breaches of the PNA and its breaches of its duty of good faith and fair dealing under the PNA.

94.    There is a bona fide, actual, present, and practical need for a declaration of 340 Biscayne's rights and obligations under the PNA based on present, ascertainable facts.

95.    340 Biscayne's powers, privileges and/or rights to recission of the PNA depend on the facts or the law that applies to those facts.

96.    340 Biscayne and Cirrus have actual, present, adverse and antagonistic interests in relation to the validity and enforceability of the PNA.

97.    All parties with an adverse and antagonistic interest in the subject matter at issue are before the Court by proper process.

98.    The declaration sought herein does not amount to a request for mere legal advice.

WHEREFORE, 340 Biscayne respectfully requests that the Court (a) enter a declaratory judgment that in light of Cirrus' breaches of the PNA and Cirrus' breaches of its implied duty of good faith and fair dealing under the PNA, 340 Biscayne is entitled to rescission of the PNA, enabling 340 Biscayne to pursue all of its claims, counterclaims and defenses against Cirrus; and (b) grant 340 Biscayne any such further relief that the Court deems just and proper.

## COUNT IV

## DECLARATORY RELIEF
### (CIRRUS' FRAUD IN THE INDUCMENT—RESCISSION)

99. 340 Biscayne reallege and incorporate paragraphs 1 through 66 as if fully set forth herein.

100. This is an action for declaratory relief pursuant to section 86.011, Florida Statutes.

101. As more particularly alleged above, Cirrus fraudulently induced 340 Biscayne to sign the PNA for a singular and deceitful purpose: to cause 340 Biscayne to release and waive its claims, counterclaims and defenses against Cirrus.

102. Given Cirrus' fraudulent inducement, 340 Biscayne seeks a declaration that it is discharged of all obligations under the PNA including, without limitation, its releases and waivers of its claims, counterclaims and defenses against Cirrus.

103. Rescission of the PNA is an appropriate and effective remedy since the parties can be restored to the status quo before their execution of the PNA.

104. 340 Biscayne is in doubt as to its rights, status, and obligations to honor the releases and waivers under the PNA given that Cirrus fraudulently induced 340 Biscayne to sign the PNA to cause it to release and waive all its claims, counterclaims and defenses against Cirrus in litigation Cirrus *knew* it would be filing against 340 Biscayne.

105. There is a bona fide, actual, present, and practical need for a declaration of 340 Biscayne's rights and obligations under the PNA based on present, ascertainable facts.

106. 340 Biscayne's powers, privileges and/or rights to recission of the PNA depend on the facts or the law that applies to those facts.

107. 340 Biscayne and Cirrus have actual, present, adverse and antagonistic interests in relation to the validity and enforceability of the PNA.

108.     All parties with an adverse and antagonistic interest in the subject matter at issue are before the Court by proper process.

109.     The declaration sought herein does not amount to a request for mere legal advice.

WHEREFORE, 340 Biscayne respectfully requests that the Court:  (a) enter a declaratory judgment that in light of Cirrus' fraudulent inducement of 340 Biscayne to sign the PNA, 340 Biscayne is entitled to rescission of the PNA, enabling 340 Biscayne to pursue its claims, counterclaims and defenses against Cirrus; and (b) grant 340 Biscayne any such further relief that the Court deems just and proper.

## COUNT V

## VIOLATION OF CHAPTER 687, FLORIDA STATUTES (USURY)

110.     340 Biscayne realleges and incorporates paragraphs 1 through 66 as if fully set forth herein.

111.     This is an action for damages brought pursuant to Florida Statute §§ 687.02, 687.03, 687.04, 687.071, and 687.147(1).

112.     Lender, Agent, 340 Biscayne, and BH are all Delaware entities.

113.     340 Biscayne and BH are registered and authorized to do business in the State of Florida.

114.     All negotiations between the principals of Cirrus, 340 Biscayne and BH regarding the Loan Documents took place in Florida.

115.     The Property which serves as collateral for the Loan is in Miami, Florida.

116.     Cirrus does not have *any* legitimate or genuine connection to New York; nor does

22

it have a "substantial or normal relation" to New York.[6]

117.    Agent has ***never*** been registered to conduct business in New York.

118.    Agent's sole "connection" to New York—it maintains a mailbox in its lawyer's New York offices—is strictly for "optics" and to attempt to benefit from New York's lack of usury regulation for loans (like the one at issue) that exceed $2.5 Million.

119.    Lender was not registered to do business in New York at any time material to this Complaint.  In fact, Lender did not register to conduct business in New York until October 31, 2024 – a year and a half *after* the Loan Agreement was executed and a week *after* Lender unlawfully sought to schedule an auction of BH's membership interest in 340 Biscayne Owner.[7] Lender was not registered to conduct business in New York at the time the parties entered into the Loan Agreement described below (i.e., April 24, 2023) or anytime thereafter until October 31, 2024.

120.    All payments 340 Biscayne made to the Lender in connection with the Loan were made to JLL Real Estate Capital, LLC in Pittsburgh, PA at Cirrus' direction.

121.    Agent's principal and Managing Partner, Tufariello, the individual with whom the Debtors dealt most extensively throughout the parties' relationship, is a resident of Florida.

122.    The Loan was negotiated and executed in Florida, and all in-person meetings between Cirrus and the Debtors took place in Florida.

123.    The Loan was closed and funded through a title insurance company in Florida.

124.    Cirrus loaned money to 340 Biscayne, as set forth in the Loan Documents, and is

---

[6] In previous filings in this litigation, Cirrus misleadingly represented that (a) "Agent is headquartered in New York (b) "Agent's principal place of business is New York" and (c) payments under the Loan Documents were made "at Agent's office [in New York]."[6]  These representations were materially misleading and/or false.

[7] The auction was stayed due to the filing of this Chapter 11 case.

thus a Creditor as defined in Florida Statute, § 687.071(1)(b).

125.    340 Biscayne received an extension of credit from Cirrus and is thus a Debtor as defined in Florida Statute, § 687.071(1)(c).

126.    The Loan Documents constitute a contract for the payment of interest upon a loan.

127.    Pursuant to Florida statute § 687.03, it is unlawful to charge interest in excess of 25 percent per annum on an extension of credit that exceeds $500,000.

128.    Pursuant to Florida Statute § 687.071(2), any person who charges interest at a rate exceeding 25% per annum on an extension of credit commits criminal usury.

129.    Cirrus knowingly, intentionally and willfully charged interest on the Loan at a rate exceeding 25% per annum, in violation of Florida Statute § 687.071(2).

130.    Pursuant to Florida Statute § 687.04, a person who violates § 687.03 forfeits all such interest charged.

131.    Pursuant to Florida Statute § 687.071(7), a criminally usurious contract is unenforceable.

WHEREFORE, 340 Biscayne respectfully requests the entry of a judgment (a) declaring the Loan  usurious and unenforceable, (b) denying Cirrus the right to receive the principal and unpaid interest, fees and any other charges under the Loan Documents, (c) awarding 340 Biscayne the amount of the interest, late fees and other charges already paid to Cirrus under the Loan Documents, plus interest, (c) awarding reasonable attorneys' fees and costs to 340 Biscayne, and (d) granting such other and further relief as is just and proper.

## COUNT VI

### BREACH OF CONTRACT AND BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING (LOAN AGREEMENT)

142.    340 Biscayne realleges and incorporates paragraphs 1 through 66 as if fully set forth

herein.

143.    This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing as to the Loan Agreement.

144.    The Loan Agreement constitutes a contract between Cirrus and 340 Biscayne.

145.    The Loan Agreement contains an implied duty of good faith and fair dealing.

146.    Pursuant to the Loan Agreement, Cirrus held $600,000 of Structural Reserve Funds in a Structural Reserve.

147.    Upon request by 340 Biscayne, and submission of certain documentation, Cirrus was required to disburse the Structural Reserve Funds to 340 Biscayne to pay for or reimburse 340 Biscayne for the Structural Work.

148.    340 Biscayne properly requested disbursement of the Structural Reserve Funds. However, in blatant breach of paragraph 6.3.2 of the Loan Agreement Cirrus refused or failed to disburse the Structural Reserve Funds to or for the benefit of 340 Biscayne.

149.    Cirrus breached the Loan Agreement by unreasonably refusing to use 340 Biscayne's preferred bank for the required DACA (Deposit Account Control Agreement) account and rejecting 340 Biscayne's placement of insurance.  Cirrus then used its refusal and rejection as manufactured "foot faults" by 340 Biscayne to declare a default and then used those manufactured defaults to justify its refusal to release the $600,000 of Structural Reserve Funds.

150.    Cirrus breached the Loan Agreement by intentionally charging excessive interest, charges and late fees, by failing to properly calculate and charge such interest, charges and late fees in accordance with the Loan Agreement and Note.  Cirrus overstated the amount of the Claims, by *inter alia*;

    a.    Improperly charging late fees on the principal amount of the Loan;

b.   Improperly charging interest on late fees;

c.   Failing to properly apply interest payments received from 340 Biscayne on the dates received;

d.   Failing to apply all of the interest payments made by 340 Biscayne;

e.   Failing to apply the funds in the Structural Reserve Fund and Project Monitor Reserve against the indebtedness; and

f.   Improperly calculating the contract interest rate charged on the Loan by applying a higher SOFR rate.

151.   Cirrus also breached its implied duty of good faith and fair dealing by unreasonably and intentionally delaying its response to, and approval of, the DPDA proposal.  The delay derailed the DPDA and deprived 340 Biscayne of the opportunity to obtain funding and the ability to generate interim income from a commercial parking facility post-demolition.  With this funding, 340 Biscayne would have avoided the vulnerable financial position that Cirrus later exploited by declaring a maturity default and imposing default interest and penalties.

152.   340 Biscayne performed under the Loan Agreement as required.

153.   All conditions required for Cirrus' performance under the Loan Agreement had occurred.

154.   Cirrus' conduct was not consistent with 340 Biscayne's reasonable expectations under the Loan Agreement.

155.   As a direct and proximate result of Cirrus' breaches of the Loan Agreement, 340 Biscayne suffered damages to be established at trial.

156.   As a direct and proximate result of Cirrus' breaches of the Loan Agreement and its breaches of its duty of good faith and fair dealing, 340 Biscayne suffered damages, including, *inter*

*alia*, (i) the loss of the $10,000,000 DPDA Payment that would have provided funds for payment of interest and to replenish the Interest Reserve required by the Loan Agreement along with other benefits under the DPDA, (ii) continued operating costs that would have been eliminated, (iii) costs associated with the Project Monitor, (iv) additional capital costs associated with bringing the Property into compliance with Unsafe Structures Orders, (v) default interest and fees charged as a result of the Default, and (vi) the need for this Chapter 11 case.

WHEREFORE, 340 Biscayne respectfully requests the entry of a judgment (a) finding Cirrus breached the Loan Agreement and breaches its implied covenant of good faith and fair dealing, (b) awarding damages against Cirrus, and (c) granting such other and further relief as is just and proper.

## COUNT VII

## OBJECTION TO CLAIMS

157.    The Debtors reallege and incorporate paragraphs 1 through 66 as if fully set forth herein.

158.    This is an objection to claims pursuant to 11 U.S.C. § 502(b)(1).

159.    The Debtors object to the Claims on the basis that, *among other things*, (a) the Claims are duplicative of one another, (b) the Claims are based on an unenforceable loan and are facially usurious, (c) Cirrus intentionally overstated the interest, late charges, and fees in violation of the terms of  the Loan Documents, thereby overstating the Claims, (d) the Claims fail to attach proper documentation to support the Claims, (e) the Claims must be reduced by the amount of damages due to the Debtors, and (f) the Claims assert a security interest in the cash collateral of 340 Biscayne, which interest was never perfected prior to the Petition Date, and is therefore unenforceable.

160.     First and foremost, Cirrus failed to establish a *prima facie* claim by failing to attach supporting documentation to substantiate the *amount* of the Claims.  While Cirrus attached documentation to support the *existence* of a loan, the only documentation related to the amount of the debt was a half-page statement of the amounts charged with no information to support it or provide any insight into the manner in which it was calculated.  In fact, the Claims lack such basic information as the interest rates applied for any given period, application of interest payments made by 340 Biscayne prior to the Petition Date, the basis for late fees and breakdown of the late fees charged, documentation to support the "Associated Fees" they allege are due, an accounting of the Reserves held by Cirrus under the Loan Documents, the treatment of the Reserves held by Cirrus and the interest that has accrued on the Reserves, or any other information needed to justify the amount of the debt they assert under the Claims.

161.     Cirrus also failed to attach any documentation to support its contention that it has a security interest in the Debtors' cash and cash equivalents.  Cirrus does not have such security interest and never perfected any security interest in the Debtors' cash or cash equivalents prior to the Petition Date, and the Debtors dispute any lien Cirrus asserts on the cash and cash equivalents.

162.     Cirrus overstates the amount of the Claims, by *inter alia*;

   a.    Improperly charging late fees on the principal amount of the Loan;

   b.    Improperly charging interest on late fees;

   c.    Failing to properly apply interest payments received from 340 Biscayne on the dates received;

   d.    Failing to apply all of the interest payments made by 340 Biscayne;

   e.    Failing to apply the funds in the Structural Reserve Fund and Project Monitor Reserve against the indebtedness; and

f.   Improperly calculating the contract interest rate charged on the Loan by applying a higher SOFR rate.

163.   The Claims must be disallowed for all the reasons stated in paragraphs 1 through 67 above.

164.   The Claims must be disallowed in their entirety due to the usurious interest charged on the Loan.

165.   The debt owed to the Debtors by Cirrus and the debt asserted by Cirrus in the Claims are mutual debts and therefore subject to setoff under 11 U.S.C. § 558. Accordingly, the Debtors are entitled to offset any amounts due under the Claims by any amounts due to the Debtors based on the foregoing Counts.

166.   The Debtors reserve the right to supplement the Objections.

167.   The Debtors request that this Court disallow or reduce the Claims accordingly.

WHEREFORE, Debtors respectfully request the entry of an order (a) sustaining Debtors' objection to the Claims, (b) disallowing or reducing the Claims, and (c) granting such other and further relief as is just and proper.

Dated:  June 30, 2025                   Respectfully submitted,

                                        **PARDO JACKSON GAINSBURG &**
                                        **SHELOWITZ, PL**
                                        *Counsel for BH Downtown Miami, LLC and*
                                        *340 Biscayne Owner LLC*
                                        100 Southeast 2nd Street, Suite 2050
                                        Miami, Florida 33131
                                        Telephone: (305) 358-1001
                                        Facsimile: (305) 358-2001
                                        Email: ljackson@pardojackson.com
                                                 llovell@pardojackson.com
                                                 sramos@pardojackson.com
                                                 cfernandez@pardojackson.com

                                        By: */s/Linda Worton Jackson*_____
                                                 Linda Worton Jackson
                                                 Florida Bar No. 843164
                                                 Linsey M. Lovell
                                                 Florida Bar No. 121581


<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on June 30, 2025 via the Court's CM/ECF system upon those registered to receive electronic service.


                              By: */s/  Linda Worton Jackson*_____
                                   Linda Worton Jackson